UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, and GUCCI AMERICA, INC., a New York corporation,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>Natalia Kokhtenko,<br><br>　　　　　Defendant. | CASE NO.: 4:21-cv-3036<br><br>[PROPOSED] JUDGMENT AND PERMANENT INJUNCTION |

Before the Court is the Motion for Default Judgment filed by Plaintiffs Facebook, Inc. ("Facebook") and Gucci America, Inc. ("Gucci") (collectively the "Plaintiffs") on October 7, 2021 (the "Motion"). The Motion was properly noticed for hearing on November 9, 2021.

Upon consideration of all filings in connection with the Motion, as well as all pleadings, the Court rules as follows:

**I.  FINDINGS OF FACT**

　　**A.  Plaintiff Facebook**

　　1.  Facebook offers a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices. Complaint ("Compl.") ¶ 14.

　　2.  Facebook has several products, including Instagram. *Id.*

　　3.  Instagram is a photo and video sharing service, mobile application, and social network. Instagram is owned and operated by Facebook, Inc. *Id.* ¶ 15.

　　4.  All Facebook users agree to Facebook's Terms of Service ("Facebook TOS") and other rules that govern access to and use of Facebook, which also include the Facebook Commercial Terms ("Commercial Terms"). Compl. ¶ 17.

　　5.  The Commercial Terms apply to access and use of Facebook, Instagram, and other Facebook Products for any business or commercial purpose. *Id.*

6.     Similarly, all Instagram users agree to the Instagram Terms of Service (the "Instagram TOU," and together with Facebook TOS and Commercial Terms, the "Contracts") and to other rules that govern access to and use of Instagram. *Id.* ¶ 18.

7.     With respect to the Facebook TOS, Section 3.1 requires users to "[c]reate only one account ([their]) own)" and use that account "for personal purposes," and prohibits users from using Facebook if Facebook "previously disabled [a user's] account for violations of [the TOS] or [Facebook] Policies." *Id.* ¶ 19; Declaration of Michael Duffey ("Duffey Decl.") ¶ 2, Exs. A-C.

8.     Section 3.2.1 prohibits users from: (a) doing anything "unlawful, misleading, [] or fraudulent"; (b) doing anything that "infringes or violates someone else's rights, including their intellectual property rights"; and (c) "breach[ing] [the Facebook TOS], [Facebook] Community Standards, and other Terms and Policies that apply to [a user's] use of Facebook." Compl. ¶ 20; Duffey Decl. ¶ 2, Exs. A-C.

9.     Section 3.2.3 prohibits users from "access[ing] or collect[ing] data from [Facebook] Products using automated means (without [Facebook's] prior permission)." Compl. ¶ 21; Duffey Decl. ¶ 2, Exs. A-C.

10.    Section 3.2 of the Facebook TOS authorizes Facebook to remove content of users who "seriously or repeatedly violate" the Facebook TOS. Compl. ¶ 22; Duffey Decl. ¶ 2, Exs. A-C.

11.    As for the Commercial Terms, Section 2 thereof requires users to "represent and warrant" that "access or use of Facebook Products for business or commercial purposes complies with all applicable laws, rules, and regulations." Compl. ¶ 23; Duffey Decl. ¶ 4, Exs. F-H.

12.    Finally, the Instagram TOU prohibits users from (a) "do[ing] anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose"; (b) "do[ing] anything that violates someone else's rights, including intellectual property"; (c) "attempt[ing] to create accounts or access or collect information in unauthorized ways," "includ[ing] creating accounts or collecting information in an automated way without our express permission"; (d) "violat[ing] . . . [Instagram] Terms or [Instagram] policies"; and (e) using Instagram if Facebook "previously disabled your account for violation of law or any of [Instagram's] policies." Compl. ¶ 24; Duffey Decl. ¶ 3, Exs. D-E.

13. In addition to prohibiting Facebook and Instagram users from posting content that infringes third parties' intellectual property rights, Facebook also operates a global notice-and-takedown program that provides dedicated communication channels for rights holders to report posts or other user-generated content they believe to be infringing, including content that promotes, advertises, or sells counterfeit goods. *Id.* ¶¶ 25-26.

14. Facebook makes available publicly-accessible reporting forms to streamline and expedite the reporting of intellectual property violations, including a form for reporting counterfeits specifically. *Id.* ¶ 26.

15. Facebook further employs a global team to review these reports. *Id.* ¶ 27.

16. If a report is complete and valid, Facebook promptly removes the reported content (e.g., disables a violating account or removes a violating post). *Id.*

17. Even where a report identifies a single post (for example, a photograph on a Facebook or Instagram account), typically Facebook reviews the entire account. *Id.* ¶ 28.

18. If there is evidence of widespread infringement, rather than remove only the reported post, Facebook disables the account. *Id.*

19. Likewise, Facebook disables the accounts of Facebook and Instagram users who repeatedly violate the Terms prohibiting violations of the intellectual property rights of others. *Id.*

20. If Facebook removes reported content, or an entire account, Facebook notifies both the rights holder and the violating user of the fact of and reason for the removal. *Id.* ¶ 27.

21. In the first half of 2020, Facebook and Instagram removed more than one million posts or other user-generated content based on reports of counterfeit goods. *Id.*

**B.  Plaintiff Gucci**

22. The Gucci brand, originally founded in 1921 in Florence, Italy, is one of the best-known and most valuable global brands. *Id.* ¶ 29.

23. The Gucci brand, which is celebrating its 100th anniversary this year, is one of the most renowned and influential fashion and luxury brands in the world, a genuine global reference for fashion and accessories, sustainability, and inclusion and a benchmark for a modern, innovative business. *Id.* ¶ 30.

24. Gucci has used the GUCCI name and mark in the United States continuously since 1953. *Id.* ¶ 32.

25. Today, Gucci distributes leather goods, clothing, accessories, eyewear, footwear, home decor, lifestyle products, jewelry, and watches, among many other products, in the United States under the GUCCI mark and related iconic design marks, including the stylized GUCCI marks, Gucci's stylized GG designs and Green/Red/Green Signature Webbing shown below (collective with the mark GUCCI, the "Gucci Marks"). *Id.* ¶ 32.



26. Gucci owns/operates nearly 100 GUCCI-branded retail boutiques throughout the United States where it sells its products branded with the Gucci Marks. *Id.* ¶ 33. Gucci also sells its products through its official website, www.gucci.com/us/, and through select high end department stores, such as Saks Fifth Avenue, Nordstrom, and Bloomingdale's. *Id.*

27. Each year, Gucci spends millions of dollars on advertising to promote the goods and services offered under the Gucci Marks in the United States. *Id.* ¶ 34. As a result of Gucci's efforts and the appeal of the GUCCI brand, Gucci sells high quantities of consumer goods annually in the United States. *Id.*

28. By virtue of extensive sales, advertising, and promotion, the Gucci Marks have become instantly recognizable to the public as exclusively denoting Gucci as the source of products bearing and sold under the Gucci Marks and signaling the high quality of such products. *Id.* ¶ 35. Having acquired substantial goodwill and strong secondary meaning, the world-famous Gucci Marks are enormously valuable assets of Gucci. *Id.*

29. Along with its robust common law rights in the famous Gucci Marks, Gucci also owns numerous federal registrations for the Gucci Marks. *Id.* ¶ 36, Ex. 3; Declaration of Jessica Haugen ("Haugen Decl.") ¶ 5.

### C. Relevant Conduct by Kokhtenko

30. Since at least April 2020, Kokhtenko used a web of multiple Facebook and Instagram accounts to promote her online stores available at brends-msk.ru, luxprimer.ru, and agentromanova.ru (collectively the "Websites"), where she operated an international business that sold counterfeit goods in violation of the Facebook and Instagram Contracts. Compl. ¶ 1, 6, 44.

31. Kokhtenko's Websites specifically promoted "luxury copies," "fashion from pirates," "high-precision copies of branded clothing," and copies that are "difficult . . . to distinguish [Kokhtenko's] copies from the originals" for various brands, including Gucci. *Id.* ¶ 6, Ex. 1.

32. Her Website brendsmsk.ru referred to Kokhtenko as the "founder, ideological inspirer, and director" of her counterfeit business. *Id.* ¶ 6, Ex. 2.

33. Kokhtenko's Websites were hosted on a California-based hosting provider and promoted the ability to ship counterfeit goods to the United States, and Kokhtenko did in fact sell and ship counterfeit goods to California, as well as accept payment via a California-based payment service provider. *Id.* ¶ 12.

34. As of October 2020, Kokhtenko's Websites listed dozens of counterfeit products for sale organized by designer brand name, including Gucci. *Id.* ¶ 45, Ex. 4.

35. On her Websites, as well as on Facebook and Instagram, Kokhtenko used spurious marks that are identical to, or substantially indistinguishable from, or are otherwise confusingly similar to the Gucci Marks without Gucci's authorization. *Id.* ¶¶ 45, 49-50, Exs. 1, 4, 5.

36. She used those spurious marks in connection with a wide array of unauthorized products, including jackets, shirts, sweaters, sweatshirts, skirts, scarves, belts, footwear, hats, face masks, handbags, backpacks, watches, sunglasses and bedding. *Id.* ¶ 45, Ex. 4.

37. Between at least April 2011 and April 26, 2021, Kokhtenko accepted and was bound by the Contracts. Compl. ¶ 47.

38. She created and used multiple Facebook accounts, Facebook Pages, and Instagram accounts and agreed to all three of the Contracts. *Id.*

39. In total, Kokhtenko operated more than five Facebook accounts and more than 150 Instagram accounts across multiple devices. *Id.*

40. The Facebook TOS, Commercial Terms, and Instagram TOU, to which Kokhtenko agreed, each contain a forum selection clause that requires Plaintiffs' Complaint against Kokhtenko be resolved by this Court, and that Kokhtenko submit to the personal jurisdiction of this Court. *Id.* ¶¶ 10-11; Duffey Decl. ¶¶ 2-4, Exs. A-H..

41. Between at least April 2020 and April 26, 2021, Kokhtenko used her web of Facebook and Instagram accounts to market and promote counterfeit Gucci products. *Id.* ¶¶ 48-52, Exs. 1-2,4 and 5.

42. Since 2015, to protect Facebook and Instagram users and in response to several reports by Gucci and other brands, Facebook has taken multiple enforcement actions against Kokhtenko for violating the Contracts. *Id.* ¶ 53.

43. These include disabling her accounts on Facebook and Instagram, removing posts that promoted counterfeit products, and sending various notices to Kokhtenko about her violations of the Contracts. *Id.*

44. Nonetheless, Kokhtenko continued to access and use Facebook and Instagram to further her counterfeiting scheme, and used deceptive tactics to avoid detection and further enforcement. *Id.* ¶ 54.

45. For example, after Facebook disabled several accounts controlled by Kokhtenko, she used automation software that allowed her to create user accounts in bulk, while misrepresenting how she was accessing Facebook computers, to circumvent Facebook technological measures. *Id.*

46. Kokhtenko used the new accounts she created to promote her counterfeiting operation. *Id.*

47. In total, prior to the filing of the Complaint, Facebook removed more than 125 posts from accounts used by Kokhtenko, and disabled more than 160 Facebook and Instagram accounts

and Facebook Pages for violations of the Contracts, including promoting counterfeit goods and using unauthorized automation software and other detection evasion techniques. *Id.* ¶ 55.

### D. Procedural Background

48. On April 26, 2021, Plaintiffs filed their Complaint against Kokhtenko. Dkt. No. 1.

49. On July 29, 2021, the Court granted Plaintiffs leave to serve Kokhtenko with process at "seven email addresses that defendant uses in connection with her online businesses." Dkt. No. 19 at 3-4.

50. The Court found that "service by email to those email addresses is reasonably calculated to provide defendant of notice of the pending lawsuit," and that "plaintiffs' voluntary translation of the relevant documents into Russian also ensures that defendant is provided with adequate notice of this action." *Id.* at 4.

51. On August 3, 2021, Plaintiffs effected service on Kokhtenko in accordance with the Court's Order, and filed a Certificate of Service with the Court. Dkt. No. 20.

52. Having been served on August 3, Kokhtenko's answer was due on August 24. Fed. R. Civ. P. 12(a)(1)(A)(i).

53. Kokhtenko failed to meet that deadline. Dkt. No. 23-1 ¶ 6.

54. On September 13, 2021, Plaintiffs moved for entry of default under Federal Rule of Civil Procedure 55(a), and notified Kokhtenko of the same via the above-referenced "seven email addresses that defendant uses in connection with her online businesses." Dkt. Nos. 23 and 26.

55. On September 14, 2021, the Clerk entered default. Dkt. No. 25.

56. To date, Kokhtenko has not appeared in this action or otherwise demonstrated any intention to defend against the Plaintiffs' claims. Declaration of Caroline Y. Barbee ¶ 2.

## II. CONCLUSIONS OF LAW

### A. The Court Has Subject Matter and Personal Jurisdiction

57. "Because [Gucci] alleges federal trademark infringement under the Lanham Act, the Court has subject matter jurisdiction over [those causes of action]. As a result the Court also has supplemental jurisdiction over [Plaintiffs'] related state law claims." *Vietnam Reform Party v. Viet Tan - Vietnam Reform Party*, 416 F. Supp. 3d 948, 961 (N.D. Cal. 2019) (citing 28 U.S.C. § 1367).

58. This includes Facebook's state law claim for breach of contract (Compl. ¶¶ 79-88), which arises out of the same common nucleus of operative facts as Gucci's federal trademark claims, i.e., all of the claims relate to Kokhtenko's online counterfeiting operation, through which she marketed and promoted the sale of counterfeit Gucci merchandise on Facebook and Instagram. Compl. ¶ 8; *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F. Supp. 3d 816, 823 (N.D. Cal. 2015) (court had supplemental jurisdiction over contract claim because it arose out of the same "common nucleus of operative facts" as infringement claims).

59. The Court also has diversity jurisdiction under 28 U.S.C. § 1332.

60. Complete diversity exists because Facebook is a citizen of California, Gucci is a citizen of New York, and Kokhtenko is a citizen of Russia. Compl. ¶¶ 3-5, 9.

61. The amount in controversy also exceeds $75,000. *Id.* ¶ 9.

62. Kokhtenko consented to personal jurisdiction in this Court when she created and used Facebook and Instagram accounts, including for commercial purposes, and thereby agreed to the forum selection clauses in the Contracts requiring her to submit to the personal jurisdiction of this Court. Compl. ¶¶ 10-11, 44-52; Duffey Decl. ¶¶ 2-4, Exs. A-H; *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007).

63. Kokhtenko agreed to the terms of the Contracts when she signed up for and used her web of Facebook and Instagram accounts to promote her online counterfeiting business, and therefore agreed to litigate all claims brought by Facebook in this Court. *See, e.g.*, Dkt. No. 13 ¶¶ 25, 51; Duffey Decl. ¶¶ 2-4, Exs. A-H; *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *2 (N.D. Cal. Aug. 28, 2020) (granting motion for default judgment and enforcing Facebook's forum selection clause to exercise personal jurisdiction over Ukrainian nationals in litigation initiated by Facebook).

64. Although the forum selection clauses discussed above are sufficient to confer jurisdiction, specific jurisdiction also exists based on Kokhtenko's contacts with this forum.

65. Kokhtenko purposefully availed herself of the benefits and protections of a California forum when she knowingly directed and targeted her actions at California and at Facebook, which

has its principal place of business in California. Compl. ¶ 12; *Brayton Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985 (9th Cir. 2009).

66. Kokhtenko also purposefully directed her activities to California by transacting business and engaging in commerce in California. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

67. Plaintiffs' claims arise from Kokhtenko's forum-related activities because Plaintiffs would not have been injured "but for" Kokhtenko's forum-related activities—i.e., the duties Kokhtenko undertook and breached when she contracted with Facebook in order to sell counterfeit Gucci products in violation of Gucci's intellectual property rights. *See Learjet Inc. v. Oneok, Inc.*, 715 F.3d 716, 742 (9th Cir. 2013).

68. Kokhtenko fails to present a "compelling case" that the assertion of jurisdiction would be unreasonable. *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1094 (N.D. Cal. 2014).

69. Plaintiffs' service of process by email to "seven email addresses that defendant uses in connection with her online business" was proper. Dkt. No. 19 at 3–4; *see Distinct Media Ltd. v. Shutov*, 2017 WL 1234400, at *3 (N.D. Cal. Mar. 10, 2017) (granting default judgment motion where the court "previously found that the service of process was in compliance with Federal Rule of Civil Procedure 4(f)(2)(C)").

**B. Kokhtenko is Liable to Gucci for Trademark Infringement, Counterfeiting, and Unfair Competition**

70. Gucci has brought claims for federal trademark counterfeiting and trademark infringement under 15 U.S.C. § 1114(1), as well as a claim for federal unfair competition under 15 U.S.C. § 1125(a). All of these claims stem from the same acts, namely, Kokhtenko's unlawful sales of counterfeit Gucci products.

71. The Lanham Act prohibits the unauthorized use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" where such use is likely to cause confusion, to cause mistake, or to deceive. 15 U.S.C. § 1114(1)(a). To prevail on its § 1114 Lanham Act claims, Gucci must establish that (1) it owns valid and protectable trademarks, and (2) defendants' use of similar designs creates a likelihood of confusion as to the origin or sponsorship of

[~~PROPOSED~~] JUDGMENT AND PERMANENT INJUNCTION                                                                                   - 9 -
CASE NO. 4:21-cv-3036

1   defendants' goods. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985).

2   The requirements for Gucci to prevail on its claim for federal unfair competition under **§** 1125(a) are

3   the same. *New W. Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("[w]hether we

4   call the violation infringement, unfair competition or false designation of origin, the test is identical

5   – is there a 'likelihood of confusion'").

6         72.     The Complaint sets forth Gucci's registered trademarks, and properly alleges that

7   Kokhtenko infringed those marks by selling products that exactly duplicate the registered Gucci

8   Marks such that the public is likely to be confused as to the origin of Kokhtenko's products. Compl.

9   ¶¶ 36, 58-71; *see* 15 U.S.C. §§ 1114, 1125. The Complaint also properly alleges that Kokhtenko's

10  conduct was willful and intentional, undertaken with the specific purpose to confuse and deceive

11  consumers about whether Kokhtenko's products were manufactured and sold by Gucci. *Id.* ¶¶ 60 &

12  65. Viewing Kokhtenko's products, they exactly reproduce the registered Gucci Marks. *Id.* at ¶ 51.

13        73.     Gucci's allegations are all deemed true on the Motion, and these allegations

14  unequivocally establish Kokhtenko's liability under §§ 1114 and 1125 of the Lanham Act.

15        74.     In addition, Gucci has brought claims for statutory unfair competition under

16  California Law (Cal. Bus. & Prof. Code §17200) and for common law unfair competition. In the

17  Ninth Circuit, unfair competition claims asserted under common law and under Section 17200 of the

18  Business and Professions Code are co-extensive with federal claims under Section 32 and 43(a) of

19  the Lanham Act when based on the same set of facts. *See Clearly v. News Corp.*, 30 F.3d 1255,

20  1262-63 (9th Cir. 1994; *Ford Motor Co. v. Ultra Coachbuilders*, Inc., 57 U.S.P.Q.2d 1356, 1359

21  (C.D. Cal 2000). Thus, given that Gucci's federal claims are well-pleaded and meritorious, so too are

22  its California state and common law claims.

23       **C.**     **Gucci is Entitled to Permanent Injunctive Relief**

24        75.     The Lanham Act expressly permits courts to permanently enjoin trademark infringers

25  and counterfeiters. *See* 15 U.S.C. § 1116(a). In the Ninth Circuit "[i]t is well established that courts

26  can issue injunctions as part of default judgments." *China Cent. Television v. Create New Tech.*

27  *(HK) Ltd.,* 2015 WL 12732432, at *19 (C.D. Cal. Dec. 7, 2015) (quoting *Sony Music Entm't, Inc. v.*

28  *Elias*, 2004 WL 141959, *3 (C. D. Cal. Jan. 20, 2004)); *see Priority Records, LLC v. Tabora*, 2007

WL 2517312, *2 (N.D. Cal. Aug. 31, 2007); *Levi Strauss & Co. v. Neverland Online Pty. Ltd*., 2020 WL 6931064 (N.D. Cal. July 14, 2020) (granting permanent injunctive relief in a trademark case as part of a default judgment).

76. Gucci's Complaint specifically alleges that Kokhtenko's actions have caused and, unless enjoined, will cause Gucci irreparable harm for which money damages are inadequate. Compl. ¶¶ 62, 67, 71, 74 and 78. A permanent injunction is warranted where the plaintiff demonstrates (1) that it has suffered irreparable injury; (2) that there is no adequate remedy at law; (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) that it is in the public's interest to issue the injunction. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *Id.* at 394.

77. Gucci satisfies each element of this test. First, by virtue of Kokhtenko's default and also as noted above, on the merits Gucci has established liability against Kokhtenko on multiple infringement claims. *See Levi Strauss & Co. v. Neverland Online Pty Ltd*, 2020 WL 6931065, at *6 (N.D. Cal. June 8, 2020) ("[U]pon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.") (citation omitted). Further, Kokhtenko's sale of counterfeit products in the United States causes Gucci irreparable harm by undermining its ability to control its reputation, threatening the goodwill it has established in the Gucci Marks, and causing confusion among consumers. *See Sream, Inc. v. Sahebzada*, 2019 WL 2180224, at *9 (N.D. Cal. Mar. 6, 2019) (finding the sale of counterfeit products caused irreparable injury in loss of goodwill and Plaintiffs' inability to control their reputation for the quality of their products).

78. Such harm cannot be precisely calculated or recompensed, and can only be redressed through a grant of injunctive relief. *See Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc*., 515 F. Supp. 3d 1061, 1081 (N.D. Cal. 2021) ("The loss of control over one's trademarks, reputation, and goodwill is 'a quintessentially irreparable injury.'") (citation omitted); *see also Amazon.com, Inc., v. Expert Tech Rogers PVT Ltd., et al*., 2021 WL 4461601, at *10 (N.D. Cal. Sept. 22, 2021) (finding monetary damages inadequate to prevent future infringement because "Defendants' default means there is no indication the infringement will stop.").

79. In addition, the balance of the hardships tilts entirely in Gucci's favor, as Kokhtenko cannot identify any hardships for the Court to consider. *Sream, Inc.*, 2019 WL 2180224, at *10 ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.' ") (internal omitted).

80. Finally, enjoining Kokhtenko would clearly benefit the public interest because it would "end[] conduct that is already prohibited by trademark laws." *Id.*; *see also Warner Bros. Ent. v. Glob. Asylum, Inc*., 2012 WL 6951315, at *23 (C.D. Cal. Dec. 10, 2012) ("In trademark cases, the public interest is the public's right not to be deceived or confused. Indeed, the most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy.") (citation and internal quotation marks omitted).

**D.  Kokhtenko is Liable to Facebook for Breach of Contract**

81. To state a claim for breach of contract under California law, Facebook need only allege facts showing: (1) the existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and (4) damage to plaintiff resulting therefrom. *Craigslist, Inc.*, 694 F. Supp. 2d at 1059.

82. Facebook has satisfied all four elements.

83. Valid contracts exist between Facebook and Kokhtenko. Compl. ¶¶ 17-18, 47, 80.

84. Kokhtenko agreed to all three of the Contracts with Facebook by accessing and using Facebook and Instagram, including for commercial purposes. *Id.*; *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 970 (N.D. Cal. 2015) ("Grunin agreed to Facebook's Terms when he created a Facebook account and accessed Facebook's services.").

85. "Facebook has performed all conditions, covenants, and promises required of it in accordance with their agreements with Defendant." Compl. ¶ 86.

86. Specifically, Facebook performed its obligations under the Contracts by allowing Kokhtenko to use Facebook and Instagram, including for commercial purposes, until Facebook became aware that she was in breach of the Contracts. *Id.* ¶¶ 44-45, 47-50, 53-55; *Craigslist, Inc.*,

[PROPOSED] JUDGMENT AND PERMANENT INJUNCTION                                              - 12 -
CASE NO. 4:21-cv-3036

694 F. Supp. 2d at 1059 ("Plaintiff performed by offering and allowing online posting for classified ads.").

87. Kokhtenko breached the Contracts by: (a) "using her Facebook and Instagram accounts to promote" goods that infringe the intellectual property rights of Gucci, in violation of Section 3.2.1 of the Facebook TOS, Section 2 of the Commercial Terms, and the Instagram TOU; (b) "creating multiple Facebook accounts," including for commercial purposes, and continuing to use Facebook after the company "previously disabled her accounts for violating the Facebook TOS," in violation of Section 3.1 of the Facebook TOS; (c) "accessing Facebook and Instagram using automated means," without permission, in violation of Section 3.2.3 of the Facebook TOS; and (d) "continuing to use Instagram after Facebook previously disabled her account for violating the Instagram TOU," in violation of the Instagram TOU. Compl. ¶¶ 82-85; *see also id.* ¶¶ 6, 47-50.

88. Kokhtenko's "many breaches have caused Facebook to incur damages." *Id.* ¶ 87; *see Yelp, Inc.*, 70 F. Supp. 3d at 1099 ("As a result of this breach, Catron has caused damage to Yelp.").

### D. Facebook is Entitled to Permanent Injunctive Relief and Costs

89. "A plaintiff may . . . be entitled to injunctive relief for a breach of contract claim under California law," as long as the contract is one for which specific performance is an available remedy. *See Twitch Interactive, Inc. v. Johnston*, 2019 WL 3387977, at *12 (N.D. Cal. July 26, 2019); C.C.P. §§ 3422, 3423(e).

90. Under California law, specific performance is available where the plaintiff shows: "(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 575 (1983).

91. A legal remedy would be inadequate here, including because Kokhtenko has already created and used more than 160 Facebook and Instagram accounts to engage in unlawful activity, in breach of the Contracts. *See* C.C.P. § 3422(a) (permitting a "final injunction" where "pecuniary compensation would not afford adequate relief").

92.     In addition, there is a high likelihood that, absent injunctive relief, Kokhtenko will continue to breach the Contracts – as evidenced by the fact that she has continued to breach the Contracts by creating Instagram accounts after the filing of this action – which will require Facebook to expend significant resources—indefinitely—to find and counteract her unlawful activity. Declaration of Andrew Herter ¶¶ 2-3; *See, e.g.*, *Union Oil Co. of California v. Greka Energy Corp.*, 165 Cal. App. 4th 129, 136 (2008) ("Moreover, where a party, as here, commits multiple breaches, specific performance is preferred over the inadequate remedy of repetitive future damage actions.").

93.     As noted above, each of the Contracts is valid, and Kokhtenko has breached them. Compl. ¶¶ 17-18, 47, 80; *Grunin*, 77 F. Supp. 3d at 970 (finding that defendant's creation and use of Facebook created a valid contract based on the Facebook terms, which was breached when the defendant violated the same).

94.     The element of "requisite of mutuality of remedy has been satisfied in that [Facebook] has fully performed [its] obligations pursuant to the agreement," —*i.e.*, it permitted Kokhtenko to access and use Facebook and Instagram, including for commercial purposes, until it discovered she breached the Contracts. *See* Compl. ¶¶ 44, 47-50, 86; *Henderson v. Fisher*, 236 Cal. App. 2d 468, 473 (1965) (for there to be "mutuality of remedies," the "contract must be subject to specific performance by both of the contracting parties.").

95.     The Contracts' terms are definite, and the injunction Facebook seeks tracks the exact language of the Contracts, thereby satisfying the fourth and fifth elements of specific performance. *Tamarind Lithography*, 143 Cal. App. 3d at 575 ("[W]e find the terms of the agreement sufficiently definite to permit enforcement of the respondent's performance as promised.").

96.     Kokhtenko has not appeared in this action and has not established that she would suffer *any* hardship from being prohibited from using Facebook or Instagram in the future. *Twitch Interactive*, 2019 WL 3387977, at *11.

97.     "[T]he public is not disserved by a permanent injunction, particularly because the public may have been deceived and harmed by [Kokhtenko's] trademark infringement and offering of automated bots. As such, equity favors the entry of a permanent injunction against [Kokhtenko]."

*See id.*; *see also Facebook, Inc. v. Grunin*, 77 F. Supp. 3d at 973 ("[T]he public would not be disserved by prohibiting Grunin from posting . . . deceptive ads on Facebook.").

98. Facebook is entitled to the permanent injunction described below.

## III. Order of Judgment

99. Good cause appearing, it is hereby ordered and adjudged as follows:

    a. Commencing on the "So Ordered" date of this Judgment and Permanent Injunction, Kokhtenko and her agents, servants, employees, successors, and assigns, and all other persons acting in concert or conspiracy with any of them or who are affiliated with Kokhtenko who receive actual notice of this Order, are hereby permanently enjoined and restrained from doing, or authorizing or procuring any persons to do, any of the following until such time as this Order is dissolved or modified by further Court order:

        i. Using any reproduction, counterfeit, copy, or colorable imitation of the Gucci Marks, or any mark confusingly similar thereto (the "Prohibited Marks") for or in connection with any goods or services not authorized by Gucci;

        ii. Engaging in any course of conduct likely to cause confusion, deception, or to injure Gucci's business reputation or the Prohibited Marks;

        iii. Using any false description or representation, including words or other symbols falsely to describe or represent Kokhtenko's unauthorized goods or services as Gucci's, or sponsored or associated with Gucci, and from offering such goods or services into commerce;

        iv. Manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, displaying or otherwise disposing of any products or packaging not authorized by Gucci that bear any simulation, reproduction, counterfeit copy, or colorable imitation of the Prohibited Marks;

        v. Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which is or

        may be likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, distributed, or sold by Kokhtenko are in any in any manner associated or connected with Gucci, or are sold, manufactured, licensed, sponsored, approved, or authorized by Gucci;

   vi.  Secreting, destroying altering, removing, or otherwise disposing of the any products that infringe the Prohibited Marks, or any books or records that contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, or displaying of such products;

   vii.  Effecting assignments or transfers forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in this Order, or any subsequent order or final judgment in this action;

   viii.  Using, linking, transferring, selling, or otherwise owning the domain names for the Websites, any social media or chat platforms or related apps, or any other domain name that incorporates, in whole or in part, any of the Prohibited Marks, or any domain name that is used in connection with any website that offers for sale or sells counterfeit Gucci merchandise;

   ix.  Creating, operating, owning, overseeing, or otherwise exercising control over any websites, social media, chat platforms or related apps in connection with selling, offering to sell, promoting, advertising, or otherwise depicting any counterfeit Gucci products;

   x.  Creating, operating, owning, overseeing, or otherwise exercising control over any websites, social media, chat platforms or related apps in connection that embed, incorporate, include, or otherwise display any of the Prohibited Marks;

xi. Processing any payments for or otherwise providing any online services related to the sale of counterfeit products featuring the Prohibited Marks, or any confusingly similar marks; and

xii. Accessing or attempting to access Facebook's services, platforms, and computer systems, including Instagram.

b. This Injunction shall apply throughout the world to the fullest extent of this Court's jurisdiction.

c. This is a final judgment as to all claims asserted against Kokhtenko in this action.

d. This Court shall retain jurisdiction for the purpose of making any further orders necessary or proper for the construction, modification, or enforcement of this Judgment and Permanent Injunction, and the punishment for any violations thereof.

e. Service of this Judgment and Permanent Injunction on Kokhtenko shall be made in accordance with the Court's Order at Dkt. No. 19.

**IT IS SO ORDERED**.

DATED: August 19, 2022

_____
HONORABLE YVONNE GONZALEZ ROGERS
United States District Judge